**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| TYLER VERDIECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 8:14-cv-00289-JFB-TDT |
| | ) | |
| TD AMERITRADE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE PUTATIVE CLASS ACTION COMPLAINT AND REQUEST TO TAKE JUDICIAL NOTICE

KUTAK ROCK LLP
1650 Farnam Street
The Omaha Building
Omaha, Nebraska 68102-2186
(402) 346-6000

*Of counsel*:

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Attorneys for Defendant*
*TD Ameritrade, Inc.*

## **TABLE OF CONTENTS**

**Page**

I. OVERVIEW ........................................................................................................1

II. COMMON BACKGROUND ..............................................................................2

    A.    *Flash Boys*...............................................................................................2

    B.    SEC Regulatory Oversight Of Broker Obligations To Seek Best Execution .........3

    C.    SEC Regulatory Oversight Of Payment For Order Flow ......................6

    D.    June 17, 2014 U.S. Senate Committee Hearing....................................8

III. THIS ACTION..................................................................................................10

    A.    The Parties ............................................................................................10

    B.    Plaintiff's Allegations ..........................................................................11

IV. ARGUMENT ....................................................................................................12

    A.    The Standard Of Review......................................................................14

    B.    This Action Should Be Dismissed Because Plaintiff's State Law Theories Of Recovery Are Preempted By SLUSA ............................................17

        1.    Plaintiff's Allegations Satisfy SLUSA's "Covered Class Action" Definition ...........................................................19

        2.    Plaintiff's Claims Are Based On State Law ..............................20

        3.    Plaintiff's Claims Are Based Upon Allegations That Involve In Substance Misrepresentations Or Omissions, Or A Manipulative Or Deceptive Device...............................................................20

        4.    Plaintiff Alleges That TD Ameritrade's Conduct Was In Connection With The Purchase Or Sale Of Covered Securities...............24

    C.    This Action Should Be Dismissed Because Plaintiff's Claims Are Preempted By Federal Regulations ...............................................25

        1.    State Law Claims That Conflict With The Purpose And Objectives Of The Federal Regulatory Framework Are Preempted...........................26

        2.    Order Flow Payments And Order Execution Are The Subject Of Extensive Federal Regulation ...................................................28

i

3.     Plaintiff's State Law Claims Conflict With The Federal Regulatory Framework ............................................................................30

D.    Plaintiff's Claims Should Alternatively Be Dismissed For Failure To State A Claim............................................................................................................36

    1.     Plaintiff Fails Adequately To State A Claim For Breach Of Fiduciary Duty ......................................................................................36

        a.     Plaintiff Does Not Assert Any Allegations Regarding The Factors That TD Ameritrade Purportedly Failed To Consider In Routing NMLOs To The Direct Edge Exchange.........................................................................37

        b.     Plaintiff Fails To Allege The Existence Of Any "Reasonably Available" Alternative Venue That Would Have Provided Materially Better Execution ..................................38

        c.     Generic Industry Studies Do Not Support Plaintiff's Claim .........39

        d.     Statements By A Former TD Ameritrade Executive Do Not Support Plaintiff's Claim ...............................................................40

        e.     The Senate Testimony Of A TD Ameritrade Executive Does Not Support Plaintiff's Claim ................................................41

        f.     Plaintiff's Allegations Regarding High-Frequency Traders Are A Red-Herring ......................................................................41

    2.     Plaintiff's Declaratory Judgment Claim Is Duplicative Of His Breach Of Fiduciary Duty Claim ...............................................................42

V. CONCLUSION .........................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alpharma, Inc. v. Pennfield Oil Co.*,
  No. 8:03CV401, 2008 WL 1990783 (D. Neb. May 5, 2008) ...................................................4

*Arizona v. U.S.*,
  132 S. Ct. 2492 (2012).......................................................................................................26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................14, 15, 42

*Atencio v. Smith Barney*,
  No. 04 Civ. 5653, 2005 WL 267556 (S.D.N.Y. Feb. 2, 2005) .................................24

*Barnett Bank v. Nelson*,
  517 U.S. 25 (1996)..............................................................................................................27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................14, 15, 36

*Benton v. Merrill Lynch & Co., Inc.*,
  524 F.3d 866 (8th Cir. 2008) ........................................................................................15

*Bibbo v. Dean Witter Reynolds, Inc.*,
  151 F.3d 559 (6th Cir. 1998) ........................................................................................34

*Brehm v. Capital Growth Fin., Inc.*,
  No. 07CV315, 2008 WL 553238 (D. Neb. Feb. 25, 2008).......................................18

*Buckman Co. v. Plaintiff's Legal Committee*,
  531 U.S. 341 (2001).......................................................................................................27, 39

*Capital Cities Cable Inc. v Crisp*,
  467 U.S. 691 (1984).......................................................................................................26

*Chadbourne & Parke LLP v. Troice*,
  134 S.Ct. 1058 (2014).....................................................................................................25

*Crimm v. Missouri Pacific Railroad Co.*,
  750 F.2d 703 (8th Cir. 1984) ........................................................................................4

*Crocker v. KV Pharm. Co.*,
  782 F. Supp. 2d 760 (E.D. Mo. 2010)...........................................................................36

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000).....................................................................................................26, 27

*Dahl v. Charles Schwab & Co.*,
   545 N.W.2d 918 (Minn. 1996)......................................................................33, 34

*Dikeman v. Wilkinson*,
   No. CV85-L-673, 1986 WL 12801 (D. Neb. Feb. 21, 1986)............................15, 36

*Dudek v. Prudential Secs., Inc.*,
   295 F.3d 875 (8th Cir. 2002) ........................................................................ passim

*Eirman v. Olde Discount Corp.*,
   697 So.2d 865 (Fla. Ct. App. 1997)........................................................................34

*Estate of Braunstein v. Merrill Lynch, Pierce Fenner & Smith, Inc.*,
   657 N.Y.S.2d 12 (N.Y.A.D. 1997),
   *app. dismissed*, 686 N.E.2d 1366,
   *app. denied*, 691 N.E.2d 630 (1997),
   *cert. denied*, 523 U.S. 1119 (1998).......................................................................34

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)................................................................................................26

*Geman v. SEC*,
   334 F.3d 1183 (10th Cir. 2003) .............................................................................29

*Gorog v. Best Buy Co., Inc.*,
   760 F.3d 787 (8th Cir. 2014) .................................................................................16

*Green v. Ameritrade, Inc.*,
   279 F.3d 590 (8th Cir. 2002) .......................................................................18, 19, 25

*Guice v. Charles Schwab & Co.*,
   674 N.E.2d 282 (N.Y. 1996)......................................................................... passim

*Gurfein v. Ameritrade, Inc.*,
   312 F. App'x 410 (2d Cir. Feb. 27, 2009) .........................................................38, 39, 40

*Hillsborough Co., Fla. v. Automated Med. Labs, Inc.*,
   471 U.S. 707 (1985)................................................................................................27

*In re Application of Brenner*,
   652 N.Y.S.2d 249 (N.Y. App. Div. 1996),
   *motion for leave to appeal dismissed as moot*, 90 N.Y.2d 921 (N.Y. 1997)...........26

*In re Certain Market Making Activities on NASDAQ*,
   68 S.E.C. Dkt 2693, 1998 WL 919673 (Jan. 11, 1999)..........................................30

*In re K-tel Int'l, Inc. Sec. Litig.*,
   300 F.3d 881 (8th Cir. 2002) ..................................................................................15

iv

*In re Morgan Stanley & Co., Inc.*,
   90 S.E.C. Docket 1625, 2007 WL 1364323 (May 9, 2007) ...................................30

*In re Scottrade, Inc.*,
   93 S.E.C. Dkt. 1550, 2008 WL 2510611 (June 24, 2008).....................................29

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F.Supp.2d 388 (S.D.N.Y. 2005).....................................................................23

*In re: Google Inc. Gmail Litig.*,
   No. 13-MD-02430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......................10

*International Paper Co. v. Ouellete*,
   479 U.S. 481 (1987)............................................................................................27

*Knights of Columbus Council 3152 v. KFS BD, Inc.*,
   280 Neb. 904 (2010) ...........................................................................................35

*Kurz v. Fidelity Mgt. & Research Co.*,
   556 F.3d 639 (7th Cir. 2009) ...............................................................................23

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ...............................................................................15

*Kutten v. Bank of Am., N.A.*,
   No. 06-0937, 2007 WL 2485001 (E.D. Mo. Aug. 29, 2007),
   *aff'd*, 530 F.3d 669 (8th Cir. 2008)......................................................................17

*Kutten v. Bank of Am., N.A.*,
   530 F.3d 669 (8th Cir. 2008) ......................................................................... passim

*Levitin v. PaineWebber, Inc.*,
   159 F.3d 698 (2d Cir. 1998)............................................................................27, 34

*McDaniel v. Wells Fargo Investments, LLC*,
   717 F.3d 668 (9th Cir. 2013) ...............................................................................26

*McFadden Ranch v. McFadden*,
   19 Neb. App. 366, 807 N.W.2d 785 (Neb. App. Ct. 2011). ..................................36

*McGraw v. Wachovia Secs., LLC*,
   No. 08cv2064, 2009 WL 2949290 (N.D. Iowa Sept. 10, 2009).............................36

*McKey v. Charles Schwab & Co., Inc.*,
   67 Cal.App.4th 731 (Cal. Ct. App. 1998) .............................................................34

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006)....................................................................................... passim

v

*Midwest Special Surgery, P.C. v. Anthem Ins. Cos.*,
No. 4:09CV646TIA, 2010 WL 716105 (E.D. Mo. Feb. 24, 2010)..........................................42

*Miller v. Redwood Toxicology Lab., Inc.*,
688 F.3d 928 (8th Cir. 2012) ...............................................................................................16

*Myers v. Merrill Lynch & Co., Inc.*,
No. 98-3532, 1999 WL 696082 (N.D. Cal. 1999),
*aff'd* 249 F.3d 1087 (9th Cir. 2001)....................................................................................26

*NASDAQ OMX Group, Inc. v. UBS Secs., LLC*,
770 F.3d 1010 (2d Cir. 2014)..............................................................................................31

*Newton v. Merrill Lynch*,
259 F.3d 154 (3d Cir. 2001).................................................................................................5

*Nixon v. Coeur D'Alene Tribe*,
164 F.3d 1102 (8th Cir. 1999) .............................................................................................16

*O'Neil v. Simplicity, Inc.*,
553 F. Supp. 2d 1110 (D. Minn. 2008),
*aff'd*, 574 F.3d 501 (8th Cir. 2009) .....................................................................................42

*Orman v. Charles Schwab & Co., Inc.*,
688 N.E.2d 620 (Ill. 1997)...................................................................................................34

*Pet Quarters, Inc. v. The Depository Trust & Clearing Corp.*,
545 F.Supp.2d 845 (E.D. Ark. 2008),
*aff'd*, 559 F.3d 772 .............................................................................................................4

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
559 F.3d 772 (8th Cir. 2009) ..................................................................................... passim

*Prager v. Knight/Trimark Group, Inc.*,
124 F. Supp. 2d 229 (D.N.J. 2000) ......................................................................................23

*Schreiber v. Burlington Northern, Inc.*,
472 U.S. 1 (1985).................................................................................................................22

*Securities Indus. Ass'n v Connolly*,
883 F.2d 1114 (1st Cir. 1989)..............................................................................................27

*Shulick v. PaineWebber, Inc.*,
722 A.2d 148 (Pa. 1998).................................................................................................33, 34

*Siepel v. Bank of Am.*,
239 F.R.D. 558 (E.D. Mo. 2006),
*aff'd*, 26 F.3d 1122 (8th Cir. 2008)............................................................................ passim

vi

*Silver v. H&R Block, Inc.*,
  105 F.3d 394(8th Cir. 1997) ...................................................................................10

*Sofonia v. Principal Life Ins. Co.*,
  465 F.3d 873 (8th Cir. 2006) .............................................................17, 18, 19, 24

*Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  295 F.R.D. 540 (S.D. Fla. 2013),
  appeal dismissed (Feb. 10, 2015)........................................................................40

*Telco Group, Inc. v. Ameritrade, Inc.*,
  2007 WL 203949 (D. Neb. Jan. 23, 2007),
  *aff'd*, 552 F.3d 893 (8th Cir. 2009) ..........................................................5, 23, 24

*Tellabs v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..........................................................................................2, 15

*Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*,
  No. 3:11-CV-3125-L, 2014 WL 4851558 (N.D. Tex. Sept. 30, 2014)...................40

*U.S. v. Locke*,
  529 U.S. 89 (2000)...............................................................................................27

*Williams v. First Nat'l Bank of St. Louis*,
  No. 4:14cv01458, 2014 WL 5800199 (E.D. Mo. Nov. 7, 2014) ......................12, 16

*Zannini v. Ameritrade Holding Corp.*,
  266 Neb. 492 (2003) ............................................................................................35

## STATUTES

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p, 78bb.................... passim

15 U.S.C. § 78b...................................................................................................27

15 U.S.C. § 78k-1(a)........................................................................................3, 28

44 U.S.C. § 1507...................................................................................................4

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ................................. passim

Securities Act of 1933, 15 U.S.C. § 77a et seq. ...........................................................17

Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. ................................3, 17, 28

## OTHER AUTHORITIES

U.S. Const. Art. VI, cl. 2.........................................................................................26

17 C.F.R. § 242.600(b)(38) ................................................................................................3

17 C.F.R. § 240.10b-10 ........................................................................................... passim

17 C.F.R. § 240.10b-5 ......................................................................................................24

17 C.F.R. § 240.11ac1-3 ....................................................................................................4

17 C.F.R. § 242.605 ...........................................................................................................8

17 C.F.R. § 242.606 .................................................................................................. passim

44 Fed. Reg. 20,360, 1979 WL 171078 (Mar. 22, 1979) ................................................5

59 Fed. Reg. 55,006-01, 1994 WL 587790 (Nov. 2, 1994) ..................................... passim

65 Fed. Reg. 75,414-01, 2000 WL 1721163 (Dec. 1, 2000) ........................................6, 7

71 Fed. Reg. 50,959-01, 2006 WL 3472378 (Aug. 28, 2006) .........................................5

Fed. R. Civ. P. 12(b)(6) ............................................................................................ passim

Fed. R. Evid. 201 ............................................................................................................16

Fed. R. Civ. P. 8 .......................................................................................................15, 36

Fed. R. Civ. P. 9(b) .............................................................................................15, 36, 40

NASD R. 2320 (2012) .......................................................................................................5

FINRA R. 5310 (2014) ............................................................................................. passim

Defendant TD Ameritrade, Inc. ("TD Ameritrade") respectfully submits this memorandum in support of its motion to dismiss the Class Action Complaint ("Complaint"), filed by plaintiff Tyler Verdieck ("Plaintiff"). The Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

This brief and the briefs that the defendants have submitted contemporaneously in the other four related actions include several parts that are substantially the same or overlapping. To limit, to the extent practicable, burdening the Court with duplicative portions, the defendants have organized their briefs in the five cases into three sections. The initial section (pp. 2 to 10) sets out the common background relevant to all five related actions, and is the same in each of the five briefs. The second section (pp. 11 to 12) provides background particular to this Complaint, and the third section (pp. 12 to 42) sets out TD Ameritrade's arguments specific to this action.

## I. <u>OVERVIEW</u>

At its core, this Complaint, like the complaints in the other four similar actions before this Court, wages a broad attack on TD Ameritrade's receipt of compensation for routing orders to market centers for execution. The compensation is generally called "payment for order flow" and, for certain kinds of market centers, it is called "maker rebates." Like the others, this Complaint is built upon the unsustainable contention that, because TD Ameritrade has received or considered compensation for routing its clients' orders to various market centers, including from venues that allegedly paid the most, this *must* mean that TD Ameritrade has violated its obligation to seek best execution in the routing of its clients' orders. TD Ameritrade's best execution obligation, however, is governed by specific federal regulations that have been developed and studied over several decades by the U.S. Securities and Exchange Commission ("SEC"), and significantly, the SEC has expressly approved the practice of market centers

compensating brokerage firms for order flow and rejected the notion that the consideration or

receipt of such payments is a violation of best execution rules, as Plaintiff suggests here.[1]

Plaintiff's allegations and invocation of state law seek to distract the Court from this long-

established federal regulatory framework and from his Complaint's failure to state well-pled

allegations of fact to support an assertion that TD Ameritrade failed *to seek* best execution.

## II. COMMON BACKGROUND[2]

### A.    *Flash Boys*.

The five actions before the Court were filed in the wake of the release of Michael Lewis's

book *Flash Boys: A Wall Street Revolt* ("*Flash Boys*"), published on March 31, 2014.  Portions

of *Flash Boys* purport to describe, in sensational terms, the trading strategies of "high frequency

traders" and their intersection with obligations regarding best execution and the long-standing

practice of payment for order flow, both of which have been studied at length by the SEC and are

the subject of extensive regulation.  *See* Parts II(B)-(C), *infra* (discussing that the SEC's careful

policy balance is embodied in SEC Rule 10b-10, Rule 606 of SEC Regulation NMS, and

FINRA[3] Rule 5310 (approved by the SEC)).

Neither the Complaint nor *Flash Boys* asserts that TD Ameritrade engages in high

---

[1]        In the remainder of the brief, "payment for order flow" will include maker rebates.

[2]        This Background is drawn from (i) certain allegations of the Complaint, the truth of which is
assumed for the limited purpose of this motion, (ii) documents of public record of which this Court may
take judicial notice, and (iii) documents incorporated by reference into the Complaint.  *Tellabs v. Makor
Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as
well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in
particular, documents incorporated into the complaint by reference, and matters of which a court may take
judicial notice.").

[3]        FINRA is the commonly used acronym for Financial Industry Regulatory Authority.  FINRA
oversees securities brokerage firms and their registered representatives.  As part of its mandate, FINRA
enacts rules and publishes guidance in its role as regulator of securities firms and brokers. *See*
http://www.finra.org/industry/oversight, last visited March 24, 2015.

frequency trading (the thrust of Mr. Lewis's book), or that TD Ameritrade owns or controls any high frequency trader.

**B.      SEC Regulatory Oversight Of Broker Obligations To Seek Best Execution**.

Best execution is the federal regulatory requirement that brokers seek the best execution reasonably available for their clients' orders.  TD Ameritrade is not a market-maker.  When TD Ameritrade receives a client's order to buy or sell a security, it routes that order to a market center for execution.[4]  In doing so, TD Ameritrade is subject to an extensive, federally regulated framework regarding the routing of clients' orders for execution.

The federal regulatory obligations regarding order execution arose out of the 1975 amendments to the Securities Exchange Act of 1934, in which Congress set forth a mandate to maintain "fair and orderly markets."[5]  Thus, over three decades, the SEC has considered, regulated and approved rules regarding best execution obligations and, in that context, has considered and articulated its position on a broker's receipt of payment for order flow (here, a fraction of a penny per routed share).[6]  To that end, the SEC has made or approved

---

[4]      Market centers include market-makers, exchanges, alternative trading systems and other venues where orders are executed. *See* 17 C.F.R. § 242.600(b)(38).

[5]      In authorizing those amendments, Congress found that it was: "in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure (i) economically efficient execution of securities transactions; (ii) fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets; (iii) the availability to brokers, dealers and investors of information with respect to quotations for transactions in securities; (iv) the practicability of brokers executing investors' orders in the best market; and (v) an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer."  15 U.S.C. § 78k-1(a)(1)(C) (2012).

[6]      "Payment for order flow" is broadly defined by SEC Rule 10b-10 to include any monetary payment or other form of compensation to a broker in return for the routing of customer orders.  *See* Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. 55,006-01, 55,008, 1994 WL 587790, at *4 (Nov. 2, 1994) (citing SEC Rule 10b-10(e)(9)).  The "maker-taker model," which involves the payment of liquidity "rebates," is a variation on payment for order flow.  *See id.*

3

pronouncements on 1) the periodic regular and rigorous review of execution quality, 2) the permissibility of aggregating orders from all clients in evaluating execution quality, and 3) receipt and disclosure of compensation in connection with the routing of orders.

The SEC's final rule release for Rule 10b-10 and adopting Rule 11Ac1-3, published in 1994, is directly on point. In that release, which reviewed a series of studies and reports between 1977 and 1989 and assessed then-current market developments, the SEC identified several factors to be taken into account by broker-dealers in connection with the routing and execution of customer orders, including, among others, 1) price, 2) order size, 3) trading characteristics of the security involved, and 4) the availability of accurate information affecting choices as to the most favorable market in which execution might be sought.[7]

Obtaining the absolute best price on every order is not the standard for determining whether a broker has met its best execution obligations. Rather, the SEC requires that "the broker endeavor, using due diligence, to obtain the best execution possible given all facts and circumstances." Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. 55,006-01, 55,008 n.26, 1994 WL 587790, at *5 n.26 (Nov. 2, 1994).[8] The SEC has long acknowledged the impracticality for a broker handling a heavy volume of orders to make routing determinations on an order-by-order basis, and thus allows brokers to periodically assess the

---

[7]   *See* Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. at 55,008 n.26, 1994 WL 587790, at *5 n.26 (citing to Second Report on Bank Securities Activities: Comparative Regulatory Framework Regarding Brokerage-Type Services 97-98, n.233 (Feb. 3, 1977), as reprinted in H.R. Rep. No. 145, 95th Cong., 1st Sess. 2333 (Comm. Print 1977)).

[8]   The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number."  44 U.S.C. § 1507; *accord Pet Quarters, Inc. v. The Depository Trust & Clearing Corp*., 545 F.Supp.2d 845, 846 (E.D. Ark. 2008), *aff'd*, 559 F.3d 772 (for use in motion to dismiss); *see also Crimm v. Missouri Pacific Railroad Co*., 750 F.2d 703, 709-10 (8th Cir. 1984) (same, for use at trial); *Alpharma, Inc. v. Pennfield Oil Co*., No. 8:03CV401, 2008 WL 1990783, at *9 (D. Neb. May 5, 2008) (Bataillon, J.) (same, for use in motion for summary judgment).

execution quality of its clients' order flow in the aggregate in meeting its best execution obligations. *See id.*; *see also* Development of a National Market System, Exchange Act Release No. 15,671, 44 Fed. Reg. 20,360, 20,366, 1979 WL 171078, at *10 (Mar. 22, 1979).[9]

The factors identified above in the SEC's 1994 final rule release were also set out in NASD Rule 2320—known as the Best Execution Rule—which was approved by the SEC in 2000, amended in 2006 and re-codified in 2012, reflecting the ongoing involvement of federal regulators in this issue.[10]  Effective May 31, 2012, the SEC approved FINRA Rule 5310 (the Rule on "Best Execution and Interpositioning"), which consolidated the best execution requirements for FINRA members (including NASD Rule 2320), and which further detailed the factors for member firms (such as TD Ameritrade) to consider when undertaking their obligation to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."  FINRA Rule 5310(a).  Among the factors that "will be considered in determining whether a [broker] has used 'reasonable diligence' are: (A) the character of the market for the security (e.g., price, volatility, relative liquidity . . .); (B) the size and type of the transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction[.]"  *Id.*

---

[9]     While the SEC has recognized that a broker's compliance with best execution obligations is properly viewed in the aggregate, courts have also recognized that determining whether investors actually failed to receive best execution and suffered damage as a result requires a trade-by-trade analysis.  *See Telco Group, Inc. v. Ameritrade, Inc*., No. 05cv387, 2007 WL 203949, at *3 (D. Neb. Jan. 23, 2007) (Bataillon, J.*), aff'd*, 552 F.3d 893 (8th Cir. 2009).  *See also Newton v. Merrill Lynch*, 259 F.3d 154, 178, 180-81 (3d Cir. 2001).

[10]     *See, e.g.*, Order Approving Proposed Rule Change to Amend NASD Rule 2320(a) Governing Best Execution, Exchange Act Release No. 34-54339, 71 Fed. Reg. 50959-01, 2006 WL 3472378 (Aug. 28, 2006) (approving amendments to NASD Rule 2320).  Best execution was also the subject of NASD Notices to Members in 2001 and 2006.  *See NASD Notice To Members 01-22*, (April 2001); *NASD Notice to Members 06-58* (Oct. 2006).

Pursuant to Rule 5310, a broker is required to have procedures in place to conduct, on a quarterly basis, "regular and rigorous reviews of the quality of the executions of its customers' orders if it does not conduct an order-by-order review." *Id.* at Supplementary Material .09(a). In conducting this review, a broker "must determine whether any material differences in execution quality exist among markets trading the security" by comparing factors such as price improvement, likelihood of execution of limit orders, speed of execution, and transaction costs. *Id*.

C.    **SEC Regulatory Oversight Of Payment For Order Flow**.

In its 1994 final rule release, the SEC put to rest the notion that a broker's receipt of payment for its order flow -- in any amount -- is necessarily inconsistent with meeting its best execution obligations, as Plaintiff suggests here. So long as brokers periodically assess execution quality and seek best execution of their clients' orders taking into account the relevant facts and circumstances, those brokers may receive payments for order flow:

> Although *it may be impractical for a broker or dealer that handles a heavy volume of orders to make an individual determination regarding where to route each order it receives*, the broker or dealer must use due diligence to seek the best execution possible *given all facts and circumstances*. The Commission believes a broker or dealer must assess whether the order flow *in the aggregate*, is receiving best execution and that a broker-dealer must not allow a payment or an inducement for order flow to interfere with its efforts to obtain best execution. Accordingly, in light of a broker-dealer's obligation to *assess periodically the quality of the markets to which it routes packaged order flow* absent specific instructions from customers, *the Commission does not believe such a broker-dealer violates its best execution obligation merely because it receives payment for order flow*.

Payment for Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at *6 (emphasis added). The SEC has not wavered in this position. *Accord id.* at *5 n. 28 (SEC "believes that bulk order routing based, in part, on the receipt of order flow is not, in and of itself, a violation of [best execution] duties."); Disclosure of Order Execution and Routing Practices, Exchange Act

6

Release No. 34-43590, 65 Fed. Reg. 75,414-01, 75,420, 2000 WL 1721163, at *12 (Dec. 1 2000)

(same).  In fact, the SEC has studied the practice of payment for order flow for several decades,

and has considered the practice to be integral to a functioning market system.  *See, e.g.*, Payment

For Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at *8 (banning payment

for order flow would "represent a radical change to the industry," and concluding that disclosure

is the appropriate response to the issues raised by that practice); *id.* at *6 ("payment for order

flow may result in lower execution costs, facilitate technological advances in retail customer

order handling practices and facilitate competition among broker-dealers and securities

markets").[11]

   To inform clients of the venues to which orders are routed and the payment for order flow

that firms receive from individual market centers, the SEC requires particular disclosures

regarding the practice.  Pursuant to SEC Rule 10b-10, a broker must disclose in client

agreements, account statements and trade confirmations that payment for order flow may be

received by the broker for the transaction and, upon written request by the client, must also

disclose the source and nature of the compensation received in connection with the particular

transaction.  17 C.F.R. § 240.10b-10(a)(2)(i)(C) (promulgated in 1977, with amendment adding

specific reference to payment for order flow in 1994).  The Complaint does not allege that

TD Ameritrade failed to make these required disclosures.

   In addition, Rule 606 of SEC Regulation NMS requires quarterly disclosure of specified

order routing statistics.  TD Ameritrade publishes quarterly reports in accordance with Rule 606

of SEC Regulation NMS that identify venues to which TD Ameritrade routes orders for

execution.  *See* 17 C.F.R. § 242.606.  Those Rule 606 Reports also disclose, among other things,

---

[11]    *See generally, e.g.*, *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282, 286-288 (N.Y. 1996)
(explaining the history of federal regulations pertaining to payment for order flow).

7

payment for order flow arrangements with those venues, including a description of the amounts per share or per order that the broker-dealer receives. *Id.*[12]  The SEC instructs, however, that while statistics in Rule 606 Reports provide disclosures regarding certain of the factors relevant to order routing decisions, they are not of themselves determinative of a broker's efforts to seek best execution:

> The Commission wishes to make clear its views as to the limits of these data in evaluating a broker-dealer's compliance with its legal duty of best execution. Both Rule 11Ac1-5 and Rule 11Ac1-6 are designed to require disclosure pursuant to Section 11A of the Exchange Act. They are not antifraud rules, nor do they create new duties under the antifraud provisions of the federal securities laws. The rules themselves create neither express nor implied private rights of action. Furthermore, Rule 11Ac1-5 and Rule 11Ac1-6 do not address and therefore do not change the existing legal standards that govern a broker-dealer's duty of best execution. The market center reports will provide statistical disclosures regarding certain of the factors relevant to a broker-dealer's order routing decision, but these factors alone are not determinative of whether the broker-dealer achieved best execution.

Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 43,590, 2000 WL 1721163, at *11 (commenting on predecessor to SEC Rule 606).

**D.**     **June 17, 2014 U.S. Senate Committee Hearing**.

In response to *Flash Boys*, a U.S. Senate subcommittee held a hearing on June 17, 2014 regarding high speed trading as well as best execution and payment for order flow.  A number of industry participants, including Steven Quirk, an executive of TD Ameritrade, were invited to testify.  The complaints in each of the five actions rely upon and incorporate by reference portions of Mr. Quirk's testimony, but omit significant portions.

---

[12]     Under SEC Rule 605 (former Rule 11Ac1-5), the market centers to which TD Ameritrade routes orders must publicly disclose on a monthly basis, basic standardized information concerning their handling and execution of orders.  *See* 17 C.F.R. § 242.605.

As set forth in the publicly available transcript,[13] Mr. Quirk testified that TD Ameritrade seeks best execution of its clients' orders by, among other things, considering the factors set out in FINRA Rule 5310.  Mr. Quirk testified further that, once TD Ameritrade has satisfied itself that a particular market center meets the regulatory standards for best execution, TD Ameritrade will then consider transaction costs or revenue opportunities.  Specifically, Mr. Quirk testified in a colloquy with Senator Levin:

> Senator Levin. Is the size of the rebate offered by an exchange a factor in determining where you route nonmarketable customer orders?
>
> Mr. Quirk. The way that our committees and the people responsible for order routing approach this is they start with the best execution, and they would go through a list of variables that we should consider as hurdles. And in order to get to a point where the revenue sharing is even considered, those hurdles have to be cleared.
>
> Senator Levin. And the revenue sharing that you are talking about is the rebate?
>
> Mr. Quirk. Correct, sir.
>
> Senator Levin. When you get to that point——
>
> Mr. Quirk. Yes.
>
> Senator Levin [continuing]. After you say you have looked at the other factors, and then you look at the rebate issue, my question is: Is the size of the rebate offered by an exchange a factor in determining where you route those nonmarketable customer orders?
>
> Mr. Quirk. Yes. It would be the last factor. All things being equal, that would be a factor.
>
> Senator Levin. And so the greater the rebate, that would be where you would go if it is otherwise best market.
>
> Mr. Quirk. Yes.

Index of Evidence, Exhibit 1 (Declaration of Alex J. Kaplan, ("Kaplan Declaration"), Ex A at

---

[13]   *See* http://www.gpo.gov/fdsys/pkg/CHRG-113shrg89752/pdf/CHRG-113shrg89752.pdf, last visited March 24, 2015.

47.)[14]  Mr. Quirk also testified that TD Ameritrade routed orders to a variety of exchanges, and

some did not pay the highest rate, as reflected in TD Ameritrade's SEC Rule 606 Reports:

> <u>Senator Levin</u>. So, anyway, for virtually every trade, your customers you say were better off by your routing their orders to the exchange that paid you a rebate rather than a venue that TD Ameritrade would have had to have paid a fee. Is that true?

> <u>Mr. Quirk</u>. I would say in the subsequent 24 months, you will note in our 606s that we have routed to a number of exchanges in one quarter, and some of those exchanges would not be the exchanges which were paying the highest rate.

(*Id.* at 48.)  The complaints in each of the five actions fail to mention the SEC's admonition that

Rule 606 statistics (which identify venues to which orders are routed during a particular quarter)

are not of themselves determinative in assessing a broker's efforts to seek best execution.  *See*

Part II(C), *supra*.  Rather, contrary to the SEC's warning, the complaints focus on portions of

testimony regarding Rule 606 statistics for select time periods, and a single type of order, and

broadly allege that TD Ameritrade does not seek best execution.

### III. <u>THIS ACTION</u>

**A.   <u>The Parties</u>.**

TD Ameritrade, Inc. is a registered broker dealer with over 6 million client accounts.

(Compl. ¶ 10-11.)  Plaintiff alleges that he is a client of TD Ameritrade who "submitted at least

---

[14]   Exhibit 1.A attached to the Index of Evidence is comprised of excerpts from the official Congressional transcript of the June 17, 2014 hearing before the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs relating to the testimony of Mr. Steven Quirk, a TD Ameritrade executive.  The Court may properly consider these excerpts on a Motion to Dismiss because (i) the Complaint embraces and relies upon Mr. Quirk's testimony (*see, e.g.*, Compl. ¶ 27), and (ii) the Court may take judicial notice of these excerpts because the official transcript is a matter of public record.  *See, e.g.*, *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397(8th Cir. 1997) (affirming summary judgment on the "alternative ground" that "the district court could have granted [defendant's] motion to dismiss rather than convert the motion for summary judgment . . . [T]he district could have properly considered the complete statements in granting the motion dismiss," where "lawsuit is based only on the statements, and [plaintiff] does not dispute their content.  *[Plaintiff] cannot defeat a motion to dismiss by choosing not to attach the full statements to the complaint.*  In considering a motion to dismiss, courts accept the plaintiff's factual allegations as true, but *reject conclusory allegations of law and unwarranted inferences*.") (emphasis added) (citations omitted); *In re: Google Inc. Gmail Litig.*, No. 13-MD-02430, 2013 WL 5423918, at*6-7 (N.D. Cal. Sept. 26, 2013) (taking judicial notice of a public Senate hearing transcript).

one NMLO [non-marketable limit order] through Defendant." (*Id.* ¶ 9.)

**B.**      **Plaintiff's Allegations**.

Plaintiff alleges that TD Ameritrade violated its fiduciary duty of best execution by routing "*virtually*" all non-marketable limit orders to third-party Direct Edge, a "maker-taker" exchange offering liquidity rebates. (*Id.* ¶¶ 1-2 (emphasis added).)  Plaintiff asserts two counts: Count I for "violation of fiduciary duties and the duty of best execution," and Count II for declaratory relief.

As noted, the Complaint contains allegations with respect to a particular type of client order, which Plaintiff refers to as a "non-marketable limit orders." (*Id.*)  A limit order directs a broker to buy or sell when a stock reaches a specified price.  A limit order is "non-marketable" when the specified (or a more favorable) price is not yet available when the routed order is received by the broker – *i.e.*, the limit price on a buy order is less than the then prevailing NBB (National Best Bid), or the limit price on a sell order is more than the then prevailing NBO (National Best Offer).  (*Id.* ¶ 1 n.1.)  "Non-marketable" limit orders are considered to provide or "make" liquidity in a market.  (*Id*. ¶ 22.)  Plaintiff alleges that TD Ameritrade received "liquidity rebates" from "maker-taker" exchanges in return for the routing of non-marketable limit orders. (*Id*. ¶¶ 22-23)

Plaintiff points to general industry studies regarding the maker-taker model and the purported impact on brokers' execution obligations.  (*See*, *e.g.*, Compl. ¶¶ 28-35.)[15]  The Complaint does not allege that they analyzed the actual execution quality achieved by

---

[15]      *See* Index of Evidence Ex. 1.B and 1.C.  Exhibit 1.B to the Index of Evidence is an excerpt from a draft study by Robert H. Battalio et al. titled: *Can Brokers Have it All?  On the Relation Between Make Take Fees & Limit Order Execution Quality*, Feb. 28, 2014.  Plaintiff refers to and quotes extensively from this study in his Complaint, *see* Complaint at ¶¶ 28-36.  This exhibit is properly considered by this Court on a Motion to Dismiss because it is embraced by the Complaint and relied upon by Plaintiff as the basis of certain claims against TD Ameritrade Defendant.   *See* note 14, *supra*.

11

TD Ameritrade.

The Complaint is replete with allegations regarding third-party Direct Edge's interactions with high-frequency traders ("HFTs"), including citations to sources regarding an alleged "HFT Conspiracy." (Compl.¶¶ 44-56.)  However, the Complaint never asserts that TD Ameritrade engages in high frequency trading, or that TD Ameritrade exerts control over any exchange or high frequency trader.

Plaintiff asserts that he "submitted at least one [non-marketable limit order] through Defendant" (Compl. ¶ 9), but he does not identify a single instance in which any such order was routed to Direct Edge.  Nor does Plaintiff identify a single order in which he allegedly failed to receive best execution, much less in which he was "take[n] advantage of" by high-frequency traders.  Likewise, Plaintiff does not identify any exchanges or other venues to which TD Ameritrade supposedly should have routed his non-marketable limit orders, or explain how or why those exchanges or venues would have provided materially better execution on particular trades on a particular day.

Plaintiff purports to bring the Action on behalf of himself and "all retail clients of TD Ameritrade, Inc. who, from August 1, 2011 to the present, placed non-marketable limit orders through TD Ameritrade that were executed on the Direct Edge Exchange." (Compl. ¶ 57.)

Plaintiff seeks to recover "damages, restitution and/or disgorgement, an injunction prohibiting Defendant from basing order routing decisions on payment for order flow, and/or other equitable relief as the Court deems proper, including, but not limited to, imposition of a constructive trust upon Defendant's revenues." (Compl. at p. 25).

## IV. <u>ARGUMENT</u>

The Complaint cannot stand as pled and must be dismissed for multiple, independent reasons.

*First*, Plaintiff's assertion of state law claims is an improper attempt to artfully avoid the stringent pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  15 U.S.C. § 78u-4.  Under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Congress explicitly required that courts dismiss certain class actions that assert state law claims arising from securities transactions.  15 U.S.C. §§ 77p, 78bb. Federal law preempts "covered class actions" based on allegations involving *either* (i) a misrepresentation or omission of material fact, *or* (ii) the use of a manipulative or deceptive device, in connection with the purchase or sale of a covered security.  *See, e.g.*, *Siepel v. Bank of Am.*, 239 F.R.D. 558, 568 (E.D. Mo. 2006), *aff'd*, 26 F.3d 1122 (8th Cir. 2008) (dismissing state law claims pursuant to SLUSA, where the "essence of the Amended Complaint is that Defendants misrepresented and omitted material facts" in connection with the purchase or sale of a security).  Significantly, when assessing whether SLUSA applies to the "allegations," the Eighth Circuit instructs that courts "not rely on the names of the causes of action that the plaintiff alleges.  Instead [courts] look at the substance of the allegations, based on a fair reading.  SLUSA preemption is based on the conduct alleged, not the words used to describe the conduct."  *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670-71 (8th Cir. 2008) (affirming dismissal of breach of fiduciary duty and other state law claims as preempted by SLUSA, and collecting Eighth Circuit authorities).  Here, Plaintiff's breach of fiduciary duty and declaratory judgment claims rely on the same conclusory allegations that involve, in substance, assertions of misrepresentations or omissions and manipulative or deceptive devices in connection with securities transactions.

*Second*, and alternatively, this action is preempted because Plaintiff's claims directly conflict with the federal regulatory framework that *expressly permits* broker-dealers to route their orders to market centers in exchange for payment, so long as they comply with federal rules on

disclosure and order execution.  That regulatory framework arose out of extensive studies and commentary by the SEC, which determined – and has repeatedly reaffirmed – that a broker does not violate its best execution obligations  because it receives payment for order flow.  In the 1990's (before the enactment of SLUSA), many courts dismissed state law claims against broker-dealers relating to payment for order flow because they conflicted with – and thus were preempted by – this same federal regulatory framework.  For similar reasons, Plaintiff's state law claims must also be dismissed as preempted by federal law.

*Third*, and also alternatively, Plaintiff has failed to state any claim.  Plaintiff's breach of fiduciary duty (Count I) is deficiently pled because there are no well-pled allegations that TD Ameritrade did not *seek* to provide best execution on its clients' non-marketable limit orders. The Complaint contains no well-pled facts that TD Ameritrade failed to adhere to regulatory obligations regarding best execution (including, for example, consideration of the relevant best-execution factors when routing client trades).  Instead, Plaintiff attacks TD Ameritrade's receipt of payment for order flow.  Plaintiff also refers to generic industry studies, cherry-picked statements by TD Ameritrade executives, and alleged activities by third-party high frequency traders, none of which buttress his allegations that TD Ameritrade failed to seek best execution.

Plaintiff's declaratory judgment (Count II) claim likewise fails because it is duplicative of Plaintiff's claim for breach of fiduciary duty.

For all of these reasons, the Complaint should be dismissed with prejudice.

A.   **The Standard Of Review**.

To avoid dismissal of any claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

14

statements, do not suffice."). While a complaint is plausible when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555-57). Although the Court must accept all non-conclusory factual allegations as true, a complaint must state a claim for relief that rises above the "speculative level." *Twombly*, 550 U.S. at 555-56. Thus, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008) (quoting *Twombly*, 540 U.S. at 545). Further, claims that sound in fraud must satisfy the heightened pleading standards mandated by Rule 9(b).[16] *See*, *e.g.*, *Dikeman v. Wilkinson*, No. CV85-L-673, 1986 WL 12801, at *2 (D. Neb. Feb. 21, 1986) (applying Rule 9(b) to breach of fiduciary duty claim sounding in fraud).

"[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Further, "[w]hen deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (internal quotation and citation omitted); *see also In re K-tel Int'l, Inc. Sec. Litig.*, 300

---

[16]     Plaintiff's allegations are deficient regardless of whether they are analyzed under Rule 8 or Rule 9(b).

F.3d 881, 889 (8th Cir. 2002) ("The court may consider, in addition to the pleadings, materials 'embraced by the pleadings' and materials that are part of the public record."). [17] *See also Miller v. Redwood Toxicology Lab., Inc.,* 688 F.3d 928, 931, n.3 (8th Cir. 2012) ("While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). [18]

Moreover, a court must disregard allegations that are contradicted by the complaint itself or documents supporting them. *See, e.g., Gorog v. Best Buy Co., Inc*., 760 F.3d 787, 793 (8th Cir. 2014) (affirming dismissal of claim where the plain language of document incorporated by reference into complaint foreclosed liability); *Williams v. First Nat'l Bank of St. Louis*, No. 4:14cv01458, 2014 WL 5800199, at *4 (E.D. Mo. Nov. 7, 2014) ("Courts need not accept as true 'factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice.'") (quoting *Perry v. NYSARC, Inc.*, 424 Fed. App'x 23, 25 (2nd Cir. 2011)).

---

[17]     Rule 201 of the Federal Rules of Evidence provides for judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  Rule 201 mandates that "[a] court **shall** take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d) (emphasis supplied).

[18]     As described herein, TD Ameritrade has attached to its Index of Evidence several documents that are embraced by Plaintiff's Complaint or which the Court can take judicial notice of and properly consider on a Motion to Dismiss.  To the extent the Court does not believe these documents can be properly considered on a Motion to Dismiss, TD Ameritrade respectfully requests that the Court disregard these documents.  By submitting these documents, TD Ameritrade does not intend to convert this Motion to a Motion for Summary Judgment. *See Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999)) ("In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or opposition to the motion").

For the reasons that follow, the Complaint should be dismissed with prejudice because Plaintiff has not stated a claim against TD Ameritrade.

**B.**     **This Action Should Be Dismissed Because Plaintiff's State Law Theories Of Recovery Are Preempted By SLUSA.**

Where a claim is preempted, it is subject to dismissal under Rule 12(b)(6). *See*, *e.g.*, *Kutten v. Bank of Am., N.A.*, No. 06-0937, 2007 WL 2485001, at *3 (E.D. Mo. Aug. 29, 2007), *aff'd*, 530 F.3d 669 (8th Cir. 2008). This action is preempted by SLUSA, 15 U.S.C. § 78bb(f)(1), and must therefore be dismissed.

SLUSA amended the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "1933 Act" and "1934 Act," respectively) to preclude any action where:

(1) the action is a "covered class action" as defined in the Act,

(2) the action purports to be based on state law,

(3) the action *alleges* that defendant misrepresented or omitted a material fact (or used or employed a manipulative or deceptive device or contrivance), and

(4) the action *alleges* that the defendant's misrepresentations or omissions of material fact were made "in connection with the purchase or sale of a covered security."

*Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 876 (8th Cir. 2006) (citing 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2)) (emphasis added).

SLUSA was enacted to "prevent plaintiffs from seeking to evade the protections that Federal [securities] law provides against abusive litigation," including the heightened pleading standards under the PSLRA. *Sofonia*, 465 F.3d at 876; *accord Dudek v. Prudential Secs., Inc.*, 295 F.3d 875, 877 (8th Cir. 2002) (SLUSA remedied the unintended result of the PSLRA, which "drove many would-be plaintiffs to file their claims in state court, based on state law, in order to circumvent the strong requirements establish by the" PSLRA) (citation omitted). SLUSA,

17

together with the 1933 and 1934 Acts and the PSLRA, demonstrates that "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006). "[T]he Supreme Court instructed that SLUSA should be read with the 'presumption that Congress envisioned a *broad construction*,' so that the most troublesome class actions would be subject to the PSLRA's procedural reforms." *Siepel*, 526 F.3d at 1127 (quoting *Dabit*, 547 U.S. at 86) (emphasis added); *cf. Brehm v. Capital Growth Fin., Inc.*, No. 07CV315, 2008 WL 553238, at *2 (D. Neb. Feb. 25, 2008) (Bataillon, J.) ("SLUSA is meant to be construed broadly") (citing *Dabit*). SLUSA's breadth even "pre-empts state-law class-action claims for which federal law provides no private remedy." *Dabit*, 547 U.S. at 74.

The Eighth Circuit has held that, in applying SLUSA, a court "do[es] not rely on the names of the causes of action that the plaintiff alleges. Instead [it] look[s] at the *substance* of the allegations, based on a fair reading. SLUSA preemption is based on the conduct alleged, not the words used to describe the conduct." *Kutten*, 530 F.3d at 670-71 (citing earlier Eight Circuit opinions) (emphasis added). Thus, the Supreme Court, the Eighth Circuit and many other courts have held repeatedly that SLUSA preempts actions asserting state law claims -- *including those that assert claims for breach of fiduciary duty and declaratory relief* -- when the above-listed elements are satisfied. *See*, *e.g.*, *Dabit*, 547 U.S. at 75 (holding that SLUSA barred breach of fiduciary duty and another state law claim); *Kutten*, 530 F.3d at 670 (same); *Siepel*, 526 F.3d at 1127 (affirming SLUSA preemption of non-fraud claims); *Sofonia*, 465 F.3d at 879-80 (same, as to fraud and non-fraud claims); *Dudek*, 295 F.3d at 879-80 (same, as to claims for breach of fiduciary duty and declaratory relief).[19]

---

[19]     As explained further n. 21, *infra*, while the Eighth Circuit in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002), declined to dismiss a breach of contract claim pursuant to SLUSA, the

Accordingly, "the critical question is whether [the] complaint can reasonably be read as alleging a sale or purchase of a covered security made in reliance on the allegedly faulty information provided to [Plaintiff] and to putative class members by" TD Ameritrade. *Sofonia*, 465 F.3d at 877 (quoting *Green*, 279 F.3d at 598). As applied here, the answer to this question is yes. As explained further below, each of the SLUSA requirements is satisfied.

### 1.      Plaintiff's Allegations Satisfy SLUSA's "Covered Class Action" Definition.

SLUSA defines a "covered class action" to be an action in which:

> (I) damages sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individuals persons or members; *or*

> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members[.]

15 U.S.C. §§ 77p(f)(2)(i)(II), 78bb(f)(5)(B)(i)(II) (emphasis added). Thus, "[a] 'covered class action is a lawsuit in which damages are sought on behalf of more than 50 people." *Dabit*, 547 U.S. at 83.

Here, Plaintiff alleges that he brings this Action on behalf of himself and "all retail clients of TD Ameritrade, Inc. who, from August 1, 2011 to the present, placed non-marketable limit orders through TD Ameritrade that were executed on the Direct Edge exchange." (Compl. ¶ 57.) Plaintiff also alleges that "there are hundreds of thousands of members in the proposed Class." (*Id.* ¶ 58.) Plaintiff additionally alleges that he seeks damages on behalf of himself and the

---

allegations in *Green* (regarding a failure to provide real-time stock price information) differed crucially from those asserted here, and the Eighth Circuit's decision turned entirely on the "in connection with" requirement, which was subsequently expanded by the Supreme Court in *Dabit*. *Id.* at 598-99; *Siepel*, 526 F.3d at 1127 (limiting *Green* to the extent it is inconsistent with *Dabit*'s broad construction of "in connection with").

Class.  (*Id.* p. 25.)  Plaintiff further alleges "[c]ommon questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class."  (*Id.* ¶ 61.)  Accordingly, this action satisfies the "covered class action" definition under SLUSA.[20]

### 2.    Plaintiff's Claims Are Based On State Law.

SLUSA requires that the plaintiff's claims be based on state law.  *See* 15 U.S.C. §§ 77p(b), 78bb(f)(1).  Here, Plaintiff purports to assert claims for "breach of fiduciary duties and the duty of best execution" and declaratory relief, all based on state law.  (*See* Compl. ¶¶ 64-79 (identifying two state law theories of recovery).)

### 3.    Plaintiff's Claims Are Based Upon Allegations That Involve In Substance Misrepresentations Or Omissions, Or A Manipulative Or Deceptive Device.

SLUSA also requires that the plaintiff "allege" that the defendants either made a "misrepresentation or omission of material fact," *or* "used or employed a manipulative or deceptive device or contrivance."  15 U.S.C. §§ 77p(f)(1)(A)-(B), 78bb(f) (1)(A)-(B).  A plaintiff need not assert a federal securities claim; it is enough that the complaint asserts *allegations* "that involve" in "substance" misrepresentations, omissions or manipulative conduct, irrespective of what law plaintiff asserts is applicable.  *Dudek*, 295 F.3d at 879; *see also Kutten*, 530 F.3d at 670-71.  The Eighth Circuit rejects efforts to avoid SLUSA merely by asserting claims whose elements do not require proof of fraud.  *Dudek*, 295 F.3d at 879 (rejecting plaintiffs' contention that "SLUSA does not apply to this case because their complaint did not allege fraud or a misrepresentation or omission of material fact").  "[B]ased on a fair reading" of "the conduct alleged" in the Complaint, Plaintiff's various theories of recovery are each based upon *allegations* within the scope of SLUSA preemption.  *Kutten*, 530 F.3d at 670 (affirming

---

[20]    In the event the Court denies this motion, at the appropriate time, the TD Ameritrade Defendants will oppose any motion to certify a class.

preemption of fiduciary duty and other state law claims, explaining "we do not rely on the names of the causes of action that the plaintiff alleges").

Indeed, the core of the Complaint is fundamentally the same as the complaints in the other four actions that assert allegations that involve in substance misrepresentations or omissions, and a manipulative or deceptive device or contrivance.  Plaintiff alleges that, unbeknownst to him, TD Ameritrade "*devised* an order routing strategy" to act without Plaintiff's "authorization," and in "disregard for, and [in] violation, of its duty of best execution." (Compl. ¶¶ 1, 2, 70 (emphasis added).)  Plaintiff also alleges that, as part of this purported strategy, TD Ameritrade routed orders to the Direct Edge exchange, which had the result of "enabling predatory" and "abusive" trading "at the expense of" Plaintiff and the putative class. (*Id.* ¶¶ 2, 45-46, 71.)

Plaintiff alleges further that Direct Edge's "market ecosystem gives unfair advantages to high-frequency traders . . . at the expense of Class member trades," including a "sneak peak at market trends and Class member [non-marketable limit orders]."  (Compl. ¶¶ 2, 4.)  Plaintiff alleges that Direct Edge's special order types (such as "Hide Not Slide) allow high-frequency trading firms to cut to the front of the trading line and receive priority queue position ahead of the Plaintiff's and class's trades in violation of price-time priority.  And he alleges that the ability to gain access to the top of Direct Edge's queue is crucial to high-frequency trading firms to execute their "predatory [] strategies."  (*Id.* ¶¶ 4, 41, 45-47.)  Plaintiff contends that Direct Edge's special order types "cause[d] Plaintiff and Class member [non-marketable limit orders] to fall to the back of the queue and [sic] tend to miss execution at the *expected* time and/or price." (*Id.* ¶ 41 (emphasis added).)  Plaintiff also alleges that "Direct Edge utilized a two-tiered market where Plaintiff and Class members trade with *an informational disadvantage* to technology-

21

enhanced [high-frequency trading] firms." (*Id.* ¶ 49 (emphasis added).)

Plaintiff also alleges that Direct Edge exploits the maker-taker fee structure to "negatively influenc[e] order execution quality for Plaintiff and the Class" by charging taker fees that are "the highest in the industry" thus "caus[ing] NMLOs to be the least attractive quotes on the market." (*Id.* ¶ 29.)  In addition, Plaintiff questions the manner in which Direct Edge displays quotations: "What might *appear to be* identical quotations are in fact far from identical once the attendant taker fee is added on. (*Id.* ¶¶ 28-30 (emphasis added).)  Plaintiff also alleges that, "based on information known in the industry," TD Ameritrade "should have known" about Direct Edge's practices.  (Compl. ¶ 56.)  As such, the substance of Plaintiff's allegations strikes at the heartland of federal securities anti-fraud regulation.  *See*, *e.g.*, *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12-13 (1985) (prohibition on "manipulative" conduct excludes market activity that "was done openly").

While Plaintiff avoids *words* in his Complaint regarding TD Ameritrade that are present in certain of the other four complaints, the core of his Complaint also involves in substance allegations of misrepresentations or omissions, and a manipulative or deceptive device or contrivance.  Notwithstanding Plaintiff's artful pleading and "the names of the causes of action that the [P]laintiff alleges," the "gravamen" of what Plaintiff has alleged is fundamentally the same as the allegations asserted in the other four related cases and, thus, Plaintiff's allegations cannot withstand SLUSA scrutiny.  *Kutten*, 530 F.3d at 670-71; *Dudek*, 295 F.3d at 879.  Thus, SLUSA bars this action because – like the four other related complaints -- the Complaint here "covers the prohibited theories" addressed by the statute.  As the court in *Segal v. Fifth Third Bank, N.A.* explained:

> The question under SLUSA is not whether the complaint uses the prohibited words: "an untrue statement or omission of a material fact" or a "manipulative or

> deceptive devise or contrivance."  It is whether the complaint covers the
> prohibited theories, no matter what words are used (*or disclaimed*) in explaining
> them.

581 F.3d 305, 311 (6th Cir. 2009) (emphasis added) (affirming dismissal of breach of fiduciary

duty and other state law claims as preempted by SLUSA).

Thus, when presented with allegations that involve in substance misrepresentations or

omissions, or manipulative or deceptive devices or contrivances, courts dismiss state law claims

as preempted by SLUSA.  *See, e.g.*, *Dabit*, 547 U.S. at 78 (breach of fiduciary duty claim

preempted by SLUSA); *Kutten*, 530 F.3d at 670-71 (affirming dismissal of claims for breach of

fiduciary duty and other state law claims); *Atkinson*, 658 F.3d at 557 (affirming dismissal of 13

state-law theories of recovery, including breach of fiduciary duty, as preempted by SLUSA);

*Segal,* 581 F.3d at 312 (same); *Kurz v. Fidelity Mgt. & Research Co.*, 556 F.3d 639, 642 (7th Cir.

2009) (same as to breach of contract claim concerning best execution); *Dudek*, 295 F.3d at 879-

80 (affirming that SLUSA preempted claims for breach of fiduciary duty and declaratory relief);

*Prager v. Knight/Trimark Group, Inc.*, 124 F. Supp. 2d 229, 234-35 (D.N.J. 2000) (claims for

breach of fiduciary duty and other state law claims barred by SLUSA, where complaint alleged

defendant made false and misleading statements relating to best execution while engaging in a

four-year "pattern and practice of trading in advance of its retail customers and the selling or

buying at a profit at the expense of its customers"); *Cf. generally*, *e.g.*, *In re Van der Moolen*

*Holding N.V. Sec. Litig.*, 405 F.Supp.2d 388, 405-06 (S.D.N.Y. 2005) (indicating that well-pled

allegations of "front-running" and "trading ahead" are "forms of manipulative and deceptive

trading practices" under Section 10(b) of the 1934 Act).[21]

---

[21]   In addition, this Court's order in *Telco Group, Inc. v. Ameritrade, Inc*., 2007 WL 203949 (D.
Neb. Jan. 23, 2007) (Bataillon, J.), *aff'd*, 552 F.3d 893 (8th Cir. 2009), is not contrary to the foregoing
decisions, given the different allegations and facts at issue.  The *Telco* plaintiff, which asserted claims for
breach of fiduciary duty and other claims, sought to certify a class of Ameritrade clients whose orders

23

Accordingly, this SLUSA requirement has been satisfied, too.

4.    **Plaintiff Alleges That TD Ameritrade's Conduct Was In Connection With The Purchase Or Sale Of Covered Securities**.

Plaintiff has expressly conceded that the final SLUSA requirement is satisfied: that the Complaint alleges that TD Ameritrade's conduct was "in connection with the purchase or sale of a covered security." *Sofonia*, 465 F.3d at 876 (citing 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2)). Indeed, Plaintiff alleges that the complained of conduct concerns the routing of clients' non-marketable limit orders, and that "[i]n connection with the acts alleged in this Complaint, Defendant, directly or indirectly, used . . . the facilities of the national securities exchanges." (Compl. ¶¶ 1, 8.) Thus, the Complaint satisfies SLUSA's broad "in connection with" requirement. *See*, *e.g.*, *Dabit*, 547 U.S. at 85 (extending to SLUSA prior "in connection with" precedent in "context of § 10(b) and Rule 10b-5," including broad precedent that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else"); *accord Siepel*, 526 F.3d at 1127 ("the 'in connection with' standard of Section 10(b) is construed flexibly, not technically or restrictively"); *see also*, *e.g.*, *Atencio v. Smith Barney*, No. 04 Civ. 5653, 2005 WL 267556, at *6 (S.D.N.Y. Feb. 2, 2005) ("If, as alleged, defendants' receipt of kickbacks caused defendants to steer class members to certain funds, then those class members' claims for damages from 'retention kickbacks' are inextricably related to their purchases of shares of those funds.") (denying motion to remand and dismissing on SLUSA

---

were not executed within four minutes of the time the order was placed, and were ultimately executed at a price worse for the client than the National Best Bid or Offer (NBBO). *Id.* at *2-3. The *Telco* plaintiff further alleged that Ameritrade "failed to process cancellation orders and froze customer account funds." *Id.* at *1. There were no allegations regarding payment for order flow. After declining to certify the class, the Court went on to state that SLUSA did not preempt the claims because there were "no allegations of fraud forming the basis of plaintiff's proposed class claim." *Id.* at *11. Here, Plaintiff alleges what are in substance misrepresentations or omissions, or a manipulative and deceptive device, including that TD Ameritrade allegedly "devised an order routing strategy" that does not "attempt[] to ensure that Class members [non-marketable limit orders] receive[] the best execution possible" but instead routes those orders "to the single order execution venue, Direct Edge, that paid Defendant the highest amount per order." (Compl. ¶¶ 1-2.)

24

grounds claims against financial advisors and fund families).[22]

Because, as we have shown, this SLUSA element and all others are satisfied, SLUSA precludes this action, and the Complaint must be dismissed.

C.      **This Action Should Be Dismissed Because Plaintiff's Claims Are Preempted By Federal Regulations**.

In addition to preemption by SLUSA, Plaintiff's claims, including his demand for disgorgement or restitution of payment for order flow revenues, conflict with and intrude upon the federal regulatory framework (as implemented by the SEC) governing best execution and payment for order flow, and should be dismissed as preempted.  Plaintiff's claims would require this Court to find as a violation of law conduct that federal regulations do not prohibit.  *See, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d, 772, 776-77, 780 (8th Cir. 2009) (concerning stock borrower program); *see also*, *e.g.*, Part IV(C)(3), *infra* (collecting cases); *Final Rule: Disclosure of Order Execution and Routing Practices*, 2000 WL 1721163, at *12 ("Furthermore, the Commission believes that the possibility of multiple, inconsistent standards in interpreting this [predecessor Rule 606] information in relation to various state law claims could tend to frustrate the statutory objective of establishing and monitoring the development of a national market system and would undermine the Commission's effort to assure the practicability of brokers achieving best execution.") (citing *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282 (N.Y. 1996), *cert. denied*, 520 U.S. 1118 (1997)).  For that reason,

---

[22]      *Cf. Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058, 1061 (2014) (finding that SLUSA did not apply because subject securities were uncovered, but making clear that "[w]e do not here modify *Dabit*").  The Eighth Circuit's pre-*Dabit* opinion in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002) --  which held that SLUSA's "in connection with" requirement was not satisfied where the claim related to monthly subscription services for real time stock quotes -- does not warrant a different conclusion.  The Eighth Circuit has since limited *Green* to the extent it narrowly construed the "in connection with" requirement.  *Siepel*, 526 F.3d at 1127.  Moreover, the breach of contract claim at issue in *Green* was *not* inextricably intertwined with purchases and sales of securities, as is the case here, because it involved stock quotations rather than actual orders.  *Compare Green*, 279 F.3d at 598, *with* Compl. ¶ 1.

25

numerous courts – including the highest courts of New York, Illinois, Pennsylvania and

Minnesota – have found similar challenges to payment for order flow to be preempted on that

basis.

      **1.**     **State Law Claims That Conflict With The Purpose And Objectives Of The Federal Regulatory Framework Are Preempted**.

Under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, a state law may be preempted by

federal law in three circumstances: where Congress (as in SLUSA) explicitly preempts state law

("express preemption"), where preemption is implied because Congress has occupied the entire

field of law ("field preemption"), and where preemption arises from a conflict between federal

and state law ("conflict preemption" or "obstacle preemption").  *See Capital Cities Cable Inc. v*

*Crisp*, 467 U.S. 691, 699 (1984); *see also Arizona v. U.S.*, 132 S. Ct. 2492, 2505 (2012)

(referring to conflict preemption, and observing it is a "well settled proposition that a state law is

preempted where it 'stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress"); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S.

141, 153-54 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes. . .

. A pre-emptive regulation's force does not depend on express congressional authorization to

displace state law.").  Preemptive effect is also accorded to rules of self-regulatory organizations

such as FINRA where their rules are subject to SEC review and approval.[23]  For there to be

conflict preemption, there need not be directly opposing duties between federal and state law that

would render compliance with both a literal impossibility.  *See Crosby v. Nat'l Foreign Trade*

---

[23]    *See, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 776-77, 780 (8th Cir. 2009) (concerning stock borrow rules approved by SEC); *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 676 n.7 (9th Cir. 2013) (NASD rules); *Myers v. Merrill Lynch & Co., Inc.*, No. 98-3532, 1999 WL 696082, *8-9 &  n. 13 (N.D. Cal. 1999) (NASD rules), *aff'd* 249 F.3d 1087 (9th Cir. 2001) (all of the plaintiff's state law "claims were preempted by federal regulation of securities transactions"); *In re Application of Brenner*, 652 N.Y.S.2d 249, 252 (N.Y. App. Div. 1996) (NYSE rules), *motion for leave to appeal dismissed as moot*, 90 N.Y.2d 921 (N.Y. 1997).

*Council*, 530 U.S. 363, 379 (2000) (citations omitted) (even if the federal and state laws "share

the same goals . . .[t]he fact of a common end hardly neutralizes conflicting means"); *Securities*

*Indus. Ass'n v Connolly*, 883 F.2d 1114, 1118 (1st Cir. 1989) ("a direct, facial contradiction

between state and federal law is not necessary to catalyze an 'actual[ ] conflict', . . .") (citation

omitted).  Instead, an irreconcilable conflict sufficient to give rise to conflict preemption will

exist if state law undermines the federal regulatory framework or when state law "stan[ds] as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress

. . . ." *Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996) (citation omitted).  "What is a sufficient

obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and

identifying its purpose and effects . . . that which needs must be implied is of no less force than

that which is expressed." *Crosby*, 530 U.S. at 373.  Preemption under such circumstances is

well-established.[24]

  If a state statutory or common law claim affects "an area where there has been a history

of significant federal presence . . . there is no beginning assumption that concurrent regulation by

the State is a valid exercise of its police powers."  *U.S. v. Locke*, 529 U.S. 89, 108 (2000); *see*

*also Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 347-48 (2001).  Here, there can

be no question that there is a "significant federal presence" and an important federal interest

involved.  Congress has determined that the "*national* public interest" requires a "*national*

market system" and a "*national* system for clearance and settlement of securities transactions."

15 U.S.C. § 78b (emphasis added).  *See also*, *e.g.*, *Pet Quarters*, 559 F.3d at 780-81 (affirming

dismissal of action as preempted); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 707 (2d Cir.

1998); *Guice*, 674 N.E.2d at 286; *see also* Part IV(C)(3), *infra* (citing additional cases

---

[24] *See International Paper Co. v. Ouellete*, 479 U.S. 481, 491-92 (1987); *Hillsborough Co., Fla. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713 (1985).

concerning payment for order flow that were dismissed as preempted).

As explained below, order flow payments and order execution are the subject of extensive federal regulations. Those federal regulations, when applied here, demonstrate that Plaintiff's common law breach of fiduciary duty and declaratory judgment claims conflict with the regulatory framework and must be preempted. *See* Part IV(C)(2), *infra*. Indeed, the resolution of Plaintiff's claims necessarily would extend far beyond the parties' principal-agent relationship, and would invade this federal regulatory framework. *See* Part IV(C)(3), *infra*. And when faced with similar state law claims that infringed upon this federal regulatory framework, the vast majority of courts that have addressed those claims dismissed them as preempted. *See id.*

## 2. Order Flow Payments And Order Execution Are The Subject Of Extensive Federal Regulation.

As explained further in Part II(B)-(C), *supra*, for decades, order flow payments and order execution have been the subject of extensive federal regulation. *See also generally*, *e.g.*, *Guice*, 674 N.E.2d at 287-88 (describing the extensive federal regulatory framework relating to payment for order flow).

This regulatory structure arose out of Congress' 1975 amendments to the Securities Exchange Act of 1934, wherein Congress directed the [SEC] to facilitate the establishment of a prompt, accurate national clearance and settlement system to protect investors and the public interest." *Pet Quarters*, 559 F.3d at 776-77, 780. *See also* 15 U.S.C. § 78k-1(a)(2) (directing the SEC to establish such a system "in accordance with these findings"); Part II(B)-(C), *supra*. Congress further instructed the SEC, "by rule or order, to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system[.]" 15

U.S.C §. 78k-1(a)(3)(B).

Pursuant to this delegation of power, the SEC has promulgated federal regulations addressing (i) disclosure of order execution and routing; (ii) the propriety and disclosure of payment for order flow; and (iii) execution requirements. *See* Parts II(B)-(C), *supra* (discussing the federal regulatory rules regarding these issues). In addition to these regulations, the regulatory history reveals that the SEC has studied the potential conflicts of interest raised by payment for order flow, but rather than banning the practice, the SEC chose to regulate it through the process of mandated disclosures and an emphasis on "regular and rigorous" review of execution quality. *See* Payment for Order Flow, 1994 WL 587790, at *7-8. Moreover, the SEC has long recognized that payment for order flow can result in benefits for retail investors, including in the form of "lower commission charges to investors, expeditious executions and enhanced services." Proposed Rule, Payment for Order Flow, Exchange Act Release No. 33,026, 1993 WL 403286, at *7 (proposed Oct. 6, 1993); *see also*, *e.g.*, Payment for Order Flow, 1994 WL 587790, at *7-8; *Guice*, 674 N.E.2d at 288 (addressing same).

The SEC and FINRA have hardly neglected this field; indeed, they have brought many enforcement actions for violations of this regulatory framework. *See*, *e.g*., *Geman v. SEC*, 334 F.3d 1183, 1190 (10th Cir. 2003) (affirming SEC finding that broker-dealer violated its duty of best execution by failing to disclose that its method of executing orders deprived customers of the possibility of getting a price better than the NBBO); *In re Scottrade, Inc.*, 93 S.E.C. Dkt. 1550, 2008 WL 2510611, *1-2 (June 24, 2008) (settled action finding that retail broker violated its duty of best execution because, contrary to representations to its clients, it did not have written policies and procedures to assess liquidity at the market opening provided by market centers to which it routed NASDAQ pre-open orders and therefore did not consider the

29

availability of executions that may have been superior to the NBBO for those orders).[25]

### 3. Plaintiff's State Law Claims Conflict With The Federal Regulatory Framework.

Plaintiff alleges that TD Ameritrade failed to comply with its fiduciary duty of "best execution" of client orders.  (Compl. ¶¶ 12-13, 66-71).  Plaintiff asserts that "TD Ameritrade is required to act solely for the benefit of Plaintiff and the Class in all matters connected with executing trades" (*id.* ¶ 68), and "is not permitted to use its position as broker to further its financial interests at the expense of the Plaintiff and the Class, and is prohibited from profiting from the agency relationship to the detriment of the Plaintiff and the Class or having a personal stake that conflicts with the interests of Plaintiff and the Class interest in transactions concerning Class member trades."  (*Id.* ¶ 69).  Plaintiff also alleges that TD Ameritrade "breached its fiduciary duty of best execution" "by routing all [non-marketable limit orders] to Direct Edge for the purpose of obtaining maker rebates at the expense of Class member trades."  (*Id.* ¶ 71.)  The remedies Plaintiff seeks include "restitution, disgorgement, and injunction prohibiting Defendant from basing order routing decisions on payment for order flow," "imposition of a constructive trust upon Defendant's revenues from" payment for order flow.  (*Id.* ¶¶ 61(i), 76, p. 25 § VI.(B).)

While Plaintiff references the common law roots of the best execution regulations, Compl. ¶ 12, he acknowledges that the modern embodiment of best execution obligations are set out in an extensive regulatory framework, *id.* ¶¶ 17 n.3, 19, 19 n. 4.  Moreover, Plaintiff alleges that "Direct Edge has come under the microscope of regulators," citing press reports of an SEC

---

[25]    *See also*, *e.g.*, *In re Morgan Stanley & Co., Inc.*, 90 S.E.C. Docket 1625, 2007 WL 1364323, at *1-2 (May 9, 2007) (settled action finding that broker-dealer violated its duty of best execution by embedding undisclosed mark-ups and mark-downs in retail orders for over-the-counter securities); *In re Certain Market Making Activities on NASDAQ*, 68 S.E.C. Dkt 2693, 1998 WL 919673 (Jan. 11, 1999) (settled action finding that NASDAQ market makers failed to provide best execution for their customers' orders by favoring their own interests, or those of a cooperating market maker, over the interests of their customers)

investigation and media speculation that this investigation led to the resignation of Direct Edge's CEO.  (Compl. ¶ 55).  To give content and context to these regulations, the Court will need to look to FINRA Rule 5310 (and predecessor federal rules and commentary), SEC Rule 10b-10, SEC Rule 606, SEC Regulation NMS, and cases applying these rules and regulations.  This would involve the court in interpreting an inherently federal framework under the auspices of state law.  *See Pet Quarters,* 559 F.3d at 780-82 (affirming preemption of state law misrepresentation claims regarding a federal approved stock borrowing program; "these claims are preempted because they seek a determination from a state factfinder that a program declared efficient in rules approved under federal law was in fact not"); *see also generally NASDAQ OMX Group, Inc. v. UBS Secs., LLC,* 770 F.3d 1010, 1020-23 (2d Cir. 2014) (affirming exercise of federal jurisdiction in order-execution claim against NASDAQ market, reasoning that "although UBS's claims for relief may invoke state law of contract and tort, the duty on which these claims turn – and their particular scope as it pertains to UBS in participating in the Facebook IPO – necessarily raises disputed issues of federal securities law"; while claim purported to be based on listing agreement, "the Services Agreement does not itself specify how NASDAQ was to fill and confirm orders or otherwise conduct an IPO. Those obligations are delineated in NASDAQ's own rules . . . whether a registered securities exchange such as NASDAQ has violated its federally prescribed duty to operate a fair and orderly exchange necessarily raises a disputed question of federal law").

Plaintiff's demand that TD Ameritrade be ordered to disregard payment for order flow in routing orders and disgorge all order routing payments received is at odds with the federal standard; federal law allows for broker-dealers to route orders to venues in exchange for payment for order flow so long as they conduct "regular and rigorous review" of those sources to

determine whether there are any "material differences in execution quality."  FINRA Rule 5310,

Supplementary Material .09(b) (broker must conduct a regular and rigorous review to determine

whether there are "any material differences in execution quality").  The Complaint nowhere

suggests that TD Ameritrade failed to conduct such a review or conducted one and disregarded

its conclusions.  Plaintiff merely draws conclusions regarding best execution based on statistical

information provided under Rule 606 and cites various reports that did not address

TD Ameritrade's *actual* execution data or data concerning Plaintiff's orders, as well as a

skeptical comment from one Senator about the "coincidence" of TD Ameritrade routing orders to

sources of payment for order flow.  (Compl. ¶¶ 26-36.)  In adopting the predecessor to SEC Rule

606, the SEC not only found that using Rule 606 statistics to hold brokers liable for breaches of

duty "would be contrary to the Commission's prior statements . . . about the duty of best

execution," but also explained that it "believes that the possibility of multiple, inconsistent

standards in interpreting this [statistical] information in relation to various state law claims *could*

*tend to frustrate the statutory objective of establishing and monitoring the development of a*

*national market system and would undermine the Commission's effort to assure the*

*practicability of brokers achieving best execution*."  Disclosure of Order Execution and Routing

Practices, Exchange Act Release No. 43,590, 2000 WL 1721163, at *12 (emphasis added) (citing

*Guice v. Charles Schwab & Co*., 674 N.E.2d 282 (N.Y. 1996), *cert. denied*, 520 U.S. 1118

(1997)).  Under Plaintiff's own theory, TD Ameritrade could be found in breach of best

execution duties even if it complied with the best execution requirements approved by the SEC,

and on the basis of information the SEC itself does not consider evidence of a best execution

violation.  This would amount to "nothing more than a complaint about the Commission

approved . . . methods" for determining compliance.  *Pet Quarters,* 559 F.3d at 781.

Moreover, while Plaintiff seeks restitution or disgorgement of all alleged funds from Direct Edge's payment for order flow (Compl. ¶¶ 75-76 & p. 25), the SEC has never banned payment for order flow as an improper payment.  Instead, the SEC has required that broker-dealers make disclosure regarding payment for order flow.  *See*, *e.g*., SEC Rule 10b-10; Rule 606 to SEC Regulation NMS.  Thus, Plaintiff would apply a standard that deems illegal the very practice the SEC has studied, evaluated, and chosen to allow, by seeking a judgment that the acceptance of payment for order flow taints the execution of *all* orders, not merely those orders that allegedly did not receive best execution.  *But see Shulick v. PaineWebber, Inc.*, 722 A.2d 148, 149 (Pa. 1998) (preempting state law claims regarding payment for order flow, where plaintiff "avers that the payments could have caused orders to be placed through exchanges and dealers that did not provide the best execution possible in terms of price, etc.").

Requests for disgorgement, as Plaintiff seeks here, were at the heart of the determination by numerous courts in the 1990s that suits seeking such a remedy would effectively ban the practice of payment for order flow and were preempted: "[a]ny ruling which implies that the order flow payments might have to be remitted to the customer on a case-by-case basis would be impossible to fulfill and would require the termination of the practice of order flow payments. . . . Thus, the remedy [Plaintiff] seek[s] could frustrate the objectives of the SEC and Congress." *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918, 925 (Minn. 1996) (affirming federal preemption of state law claims relating to payment for order flow – "[a] decision by this court affecting these payments will no doubt reach far beyond the borders of Minnesota"). *See also id.* at 925-26 ("We believe that order flow payments are a useful competitive tool and that a decision requiring them to be returned to the customer would have a seriously negative impact on the efficacy of this tool.  In turn, given the complicated and intricate nature of the securities industry,

33

anything affecting a practice as widely utilized as this one will have a significant impact on the

securities markets nationwide. Whether this impact will be positive or negative is not for this

court to judge."); *Shulick*, 722 A.2d at 151 (preempting claims for breach of contract and

fiduciary duty relating to payment for order flow); *Orman v. Charles Schwab & Co.*, *Inc.*, 688

N.E.2d 620, 626 (Ill. 1997) ("Allowing plaintiffs to advance their breach of fiduciary duty and

contract claims would require the defendants to identify the nature and calculate the value of

order flow payments received so that Plaintiff's damages (the improperly retained order flow

payments) could be assessed" and doing so would have "deleterious effects to the National

Market System" because it would "effectively bring the practice of order flow payments to a

halt."); *Guice*, 674 N.E.2d at 291 (state law claims preempted by less restrictive SEC regulations

permitting brokers to receive payment for order flow with proper disclosure, because, among

other things, disclosures "which may be required under State common-law … inevitably will

supplant the disclosure rules of the SEC"; enforcing the claims "would unavoidably result in

serious interference with the accomplishment and execution of the full purposes and objectives

of Congress . . . and would directly conflict with SEC regulations limiting the disclosure

requirements regarding receipt of order flow payments.").[26]  In fact, courts have found

preemption merely where a state-law cause of action would reduce the value of a benefit the

federal framework allowed brokers and other financial institutions to retain[27] – as a rule

---

[26]     *See also Eirman v. Olde Discount Corp.*, 697 So.2d 865 (Fla. Ct. App. 1997) (dismissing order
flow payment action as preempted, based on the reasoning in *Guice*, *Orman* and *Dahl*); *McKey v. Charles
Schwab & Co., Inc.*, 67 Cal.App.4th 731 (Cal. Ct. App. 1998) (same, where "[t]he thrust of the complaint
is that a broker which receives monetary and nonmonetary incentives from wholesale securities dealers
will place its order with those dealers, without regard to the best interests of the customer.").

[27]     *See Levitin*, 159 F.3d at 704-07; *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563-64 (6th
Cir. 1998); *Estate of Braunstein v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 657 N.Y.S.2d 12, 13
(N.Y.A.D. 1997), *app. dismissed*, 686 N.E.2d 1366, *app. denied*, 691 N.E.2d 630 (1997), *cert. denied*,
523 U.S. 1119 (1998).

disgorging order flow payments even where the federal best-execution rules have been complied with would do.

The Nebraska Supreme Court, in *Zannini v. Ameritrade Holding Corp.*, 266 Neb. 492 (2003), distinguished the *Guice* line of cases on the grounds that the federal regulation at issue in *Zannini* (regarding "operational capability") was merely proposed and not yet enacted. *Id.* at 506. But this case involves the very situation that *Zannini* regarded as a proper case for preemption. *Id.* at 503-04 (explaining that, in *Guice*, there were "explicit commission regulations" concerning the Plaintiff's "complaints regarding order flow payments" and, as a result, the *Guice* court ruled that "New York common law was preempted because it could interfere with the regulations which exhibited the method by which the federal government sought to reach its stated goal regarding order flow"); *see also Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 911-14 (2010) (affirming dismissal of breach of contract claim where enacted regulatory rules regarding federal recordkeeping duties did not confer a private right of action).

Accordingly, application of state law to Plaintiff's claims would conflict with the federal laws regarding the national market system and the SEC's and FINRA's regulatory framework. *See*, *e.g.*, *Guice*, 674 N.E.2d at 290 ("When, thus, a State's regulation, through the imposition of common-law tort liability or otherwise, adversely affects the ability of a Federal administrative agency to regulate comprehensively and with uniformity in accordance with the objectives of Congress, 'then the state law may be pre-empted even though 'collision between the state and federal regulation may not be an inevitable consequence.'") (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988)).

For all of these reasons, Plaintiff's claims must be dismissed as preempted by federal

35

regulation of order routing and execution.

**D.** **Plaintiff's Claims Should Alternatively Be Dismissed For Failure To State A Claim**.

In the event that Plaintiff's claims are not held to be preempted, they should be dismissed because Plaintiff has failed to allege more than "conclusory statements," "labels and conclusions," or "threadbare recitals of the elements of [his] cause of action." *See Twombly*, 550 U.S. at 570.

**1.** **Plaintiff Fails Adequately To State A Claim For Breach Of Fiduciary Duty**.

To state a breach of fiduciary duty claim under Nebraska law, Plaintiff must plead that (1) TD Ameritrade owed him a fiduciary duty, (2) TD Ameritrade breached the duty, (3) the breach was the cause of the alleged injury, and (4) Plaintiff was damaged. *See McFadden Ranch v. McFadden*, 19 Neb. App. 366, 370 (Neb. App. Ct. 2011). Where a claim for breach of fiduciary duty sounds in fraud, it must be pled with particularity. *See*, *e.g.*, *Dikeman v. Wilkinson*, No. CV85-L-673, 1986 WL 12801, at *2 (D. Neb. Feb. 21, 1986) (granting motion to dismiss and explaining that breach of fiduciary duty claim premised on allegations of "defendants misleading the plaintiffs . . . is essentially an allegation of fraud"); *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 784-85 (E.D. Mo. 2010) (breach of fiduciary duty claim involving "scheme to misrepresent" sounds in fraud); *McGraw v. Wachovia Secs., LLC*, No. 08cv2064, 2009 WL 2949290, at *5 (N.D. Iowa Sept. 10, 2009) ("Parties must plead all averments of fraud with particularity, even if the claims are not expressly labeled as 'fraud.'") (quotation omitted).[28]

As discussed in further detail below, Plaintiff has failed to state a claim for breach of fiduciary duty.

---

[28]  Plaintiff's allegations are deficient regardless of whether they are analyzed under Rule 8 or Rule 9(b).

a.   *Plaintiff Does Not Assert Any Allegations Regarding The Factors That TD Ameritrade Purportedly Failed To Consider In Routing NMLOs To The Direct Edge Exchange.*

Plaintiff baldly alleges that "it is *all but* certain that [TD Ameritrade] is not considering" various factors bearing on best execution obligations (*see* Compl. ¶ 26 (emphasis added)). Plaintiff does not allege, however, a single well-pled fact in support of this conclusory allegation.

FINRA Rule 5310(a) requires TD Ameritrade to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the client is as favorable as possible under prevailing market conditions."  FINRA Rule 5310 also identifies several factors that are "considered in determining whether a member has used 'reasonable diligence,'" but Plaintiff does not allege, except in the most conclusory terms, that TD Ameritrade failed to consider those factors.  (*See*, *e.g.*, Compl. ¶ 17 ("Defendant does not give due consideration to the particular security being traded, or other relevant factors . . .").  Indeed, the Complaint lacks any allegations whatsoever that, when engaging in "reasonable diligence," TD Ameritrade did not consider "the character of the market for the security" (*e.g.*, price, volatility, and relative liquidity).  FINRA Rule 5310(a).  Likewise, the Complaint is devoid of any well-pled allegations that TD Ameritrade failed to consider other FINRA Rule 5310 factors, such as "the size and type of transaction," or "the number of markets checked," or "accessibility of the quotation," or "the terms and conditions of the order which resulted in the transaction."

Moreover, the SEC has never said that, by routing orders to a market center that pays the most for order flow, the broker dealer has failed to seek best execution.  Furthermore, Plaintiff's allegations, which derive from their review of TD Ameritrade's Rule 606 reports (*see*, *e.g.*, Compl. ¶ 26 n.7), ignore the SEC's directive that *Rule 606 Reports are not of themselves determinative of a broker's best execution obligations*:

37

> [W]hile the order execution and routing disclosures will represent a significant step forward in the quality of information that is currently publicly available, *they alone will not provide a reliable basis to assess a broker-dealer's compliance with its duty of best execution*. Therefore, the resulting statistics, by themselves, do not demonstrate whether or not broker-dealers have complied with their legal duties to their customers, and *to conclude otherwise would be contrary to the Commission's prior statements, discussed below, about the duty of best execution*. Furthermore, the Commission believes that the possibility of multiple, inconsistent standards in interpreting this information in relation to various state law claims could tend to frustrate the statutory objective of establishing and monitoring the development of a national market system and would undermine the Commission's effort to assure the practicability of brokers achieving best execution.

*Final Rule: Disclosure of Order Execution and Routing Practices*, 2000 WL 1721163, at *12

(explaining Rule 11Ac1-6, predecessor to SEC Rule 606).

> b.   *Plaintiff Fails To Allege The Existence Of Any "Reasonably Available" Alternative Venue That Would Have Provided Materially Better Execution.*

Plaintiff alleges that TD Ameritrade "failed to exercise reasonable care in discharging its duty to investigate whether Direct Edge's maker-taker fees and market structure [were] disadvantageous . . . when compared to other execution venues . . . ." (Compl. ¶ 56.)  However, Plaintiff does not identify a single instance in which any of *his* orders were even routed to Direct Edge. (*Id.* ¶ 9.)  Moreover, Plaintiff fails to identify any alternative "execution venue" at which he supposedly would have received materially better execution.  The omission of any such well-pled allegations is fatal to Plaintiff's claim.  *See Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 412, 414 (2d Cir. 2009) (affirming dismissal of claim against TD Ameritrade predecessor regarding alleged representation that it would route trades to "the appropriate market," where the complaint "does not appear to contain nonconclusory allegations that there was an alternative exchange that was reasonably available to Ameritrade under the circumstances and that would have offered materially better overall execution").

38

*c.    Generic Industry Studies Do Not Support Plaintiff's Claim.*

Plaintiff also purports to base his claim on generic industry studies conducted by

Professor Robert Battalio and two others (the "Battalio study"; Compl. ¶¶ 28-29)[29] and Professor

James Angel and two others (the "Angel Study"; *id.* ¶ 35).  Plaintiff alleges that the Battalio

study "confirmed that limit orders posted on high fee venues such as Direct Edge resulted in

negative improvement spread between best available bid and offer, meaning that Class member

NMLOs lose out on opportunities to receive better prices for their trades, and are generally

executed in circumstances where prices move against the Class's trade after execution."  (*Id.* ¶

34.)  Plaintiff alleges that the Angel study "found that limit orders on the venue with the higher

take fee (and thus, the higher make rebate) like Direct Edge can become isolated and miss

profitable trading opportunities . . . ."  (*Id.* ¶ 35.)  Neither of these studies supports Plaintiff's

claim.

Plaintiff does not allege that either study (i) analyzed whether *TD Ameritrade* seeks to

provide best execution on its clients' orders; (ii) considered any actual *execution quality data*

provided *by TD Ameritrade*; or (iii) analyzed any of *Plaintiff's* particular trades.[30]  Thus, such

generic industry data cannot sustain any claim against TD Ameritrade.  *See Gurfein*, 312 Fed.

App'x at 411-12 (affirming dismissal of action regarding alleged failure to obtain best execution

---

[29]     *See* Index of Evidence Ex. 1.B. Exhibit 1.B to the Index of Evidence is an excerpt from a draft
study by Robert H. Battalio et al. titled: *Can Brokers Have it All?  On the Relation Between Make Take
Fees & Limit Order Execution Quality*, March 5, 2015.  Plaintiff refers to and quotes extensively from
this study in his Complaint, *see* Complaint at ¶¶ 28-36.  This exhibit is properly considered by this Court
on a Motion to Dismiss because it is embraced by the Complaint and relied upon by Plaintiff as the basis
of certain claims against the TD Ameritrade Defendants.  *See* note 14, *supra*.

[30]     Furthermore, the "Battalio study" states on its face that it is a *draft*, and states further that it relies
on statistics from TD Ameritrade's and other brokers' SEC Rule 606 reports (Index of Evidence Ex. 1B at
35), and thus ignores the SEC's directive that such statistics "*alone will not provide a reliable basis to
assess a broker-dealer's compliance with its duty of best execution*."  Final Rule, 2000 WL 1721163, at
*12; *see also* Part II(C), *supra* (discussing the SEC's admonition regarding Rule 606 statistics).

39

on specific trades involving "Forest Labs put options," and declining to credit the plaintiff's citation to an SEC report because its "non-specific findings about orders placed through three primary direct access firms, not including Ameritrade and not involving Forrest Labs options, are too far removed from the trades at issue here to make claims regarding [the exchange's] handling of [plaintiff's] trades anything more than speculative") (citing *Twombly*, 550 U.S. at 555).[31]

As in *Gurfein*, the Court should disregard Plaintiff's speculative allegations regarding the theories presented in the Angel study and the draft Battalio study.

> d.    *Statements By A Former TD Ameritrade Executive Do Not Support Plaintiff's Claim.*

Plaintiff also alleges that "TD Ameritrade routes orders in a manner that focuses on payment from market centers at the expense of securing the best order execution for Plaintiff and members of the Class"(Compl. ¶ 20), based purportedly on statements in a 2010 article attributed to Chris Nagy, who Plaintiff alleges was TD Ameritrade's head of order routing (*id*. ¶ 21). However, while Plaintiff alleges that Mr. Nagy "confirmed that [] routing [TD Ameritrade's] marketable orders to market makers and their nonmarketable limit orders to exchanges . . . could increase revenue" (*id.*), there are no allegations that Mr. Nagy stated that routing in this way would be "at the expense of securing the best order execution" (*id.* ¶ 20).

---

[31]    *See also generally, e.g*., *Town N. Bank, N.A. v. Shay Fin. Servs., Inc*., No. 3:11-CV-3125-L, 2014 WL 4851558, at *22 (N.D. Tex. Sept. 30, 2014) ("While the study [at issue] addresses securities of the same general type as those purchased by [the plaintiff], such a connection is too tenuous and insufficient for purposes of the Rule 9(b) and the PSLRA"); *Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 295 F.R.D. 540, 549 (S.D. Fla. 2013), appeal dismissed (Feb. 10, 2015) (dismissing fraud claim, and disregarding non-particularized allegations concerning a study, reasoning "[a]s with other theories discussed above, [plaintiff's] claim regarding correlation of CDOs' securities relies on general information about the CDO market as a whole and not the specific CDOs owned by [company acquired by plaintiff]. The Federal Reserve Study, as described in the Complaint, examined mortgage-based CDOs collectively and made no findings concerning any particular CDOs or their issuing banks. [Plaintiff] yet again gives no factual support for its claim that the cross-referencing of mortgage securities in the broader CDO market affected [the subject] CDO notes and their credit ratings. Thus, [plaintiff] has not plausibly or specifically pleaded that any Defendant engaged in fraud against [company acquired by plaintiff].").

e.     *The Senate Testimony Of A TD Ameritrade Executive Does Not Support Plaintiff's Claim.*

Plaintiff also alleges that Steven Quirk, an executive at TD Ameritrade, "testified that the size of a rebate offered by execution venues influences TD Ameritrade's decision about where to route orders." (Compl. ¶ 38.)  However, based on the face of the publicly available transcript, Mr. Quirk did not testify that TD Ameritrade sought order flow payments at the expense of best execution obligations, and Plaintiff does not allege otherwise.  (*See* Kaplan Decl. Ex. 1.A at 47-48.)

f.     *Plaintiff's Allegations Regarding High-Frequency Traders Are A Red-Herring.*

Plaintiff alleges that, as a result of "TD Ameritrade's decision to route all Class member NMLOs to Direct Edge[,] . . . Class member orders interact[]with toxic HFT strategies designed to take advantage of unsophisticated retail order flow." (Compl. ¶ 39.)  This wholly conclusory allegation – along with Plaintiff's *dozens* of other such allegations regarding high frequency trading that nowhere mention TD Ameritrade – is a red herring.  Plaintiff does not allege that TD Ameritrade engages in high-frequency trading, that it controls any high-frequency traders, or that it participates in any manipulation by high-frequency traders.  Rather, Plaintiff's own allegations state that TD Ameritrade is removed from any such conduct: TD Ameritrade routes orders to Direct Edge; Direct Edge transacts with high-frequency traders; and certain high-frequency traders attempt to engage in trading that Plaintiff characterizes as toxic.  (*Id.* ¶¶ 1, 39.)  Furthermore, Plaintiff does not specify a single order that was supposedly subjected to "toxic" high-frequency trading.  In addition, none of Plaintiff's allegations regarding high-frequency trading says anything about the manner in which TD Ameritrade seeks (or fails to seek) to obtain best execution on client orders.

Equally infirm are Plaintiff's allegations that, "*based on information known within the*

*industry*, Defendant *should have known* that routing all of its client's NMLOs to Direct Edge would result in the least preferential trading position for Plaintiff and other Class members." (Compl. ¶ 56 (emphasis added).)  Again, what TD Ameritrade "should have known" is purely speculative and says nothing about what it *did know* or its efforts to seek best execution based on that knowledge.  Thus, this conclusory allegation cannot support Plaintiff's claim.  *Iqbal*, 556 U.S. at 678.

### 2. Plaintiff's Declaratory Judgment Claim Is Duplicative Of His Breach Of Fiduciary Duty Claim.

Plaintiff's declaratory judgment claim (Count II) should be dismissed because it is duplicative of and consumed by Plaintiff's breach of fiduciary duty claim (Count I).[32]  This claim fails in any event because Plaintiff has failed to allege well-pled facts that TD Ameritrade does not seek best execution on Plaintiff's or the putative class's non-marketable limit orders. *See* Part IV(D)(1), *supra*.

---

[32]    *See*, *e.g.*, *O'Neil v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1113 n. 4 (D. Minn. 2008), *aff'd*, 574 F.3d 501 (8th Cir. 2009) (declining to hear a declaratory judgment claim that "seeks a determination that [the defendant] 'is obligated under its Limited Warranty to repair or replace Class members' unsafe and defective Cribs'" as "duplicative of the breach-of-warranty claim," even where breach of warranty and consumer fraud claims also failed for lack of damages and a basis for injunctive relief); *Midwest Special Surgery, P.C. v. Anthem Ins. Cos.*, No. 4:09CV646TIA, 2010 WL 716105, at *6 (E.D. Mo. Feb. 24, 2010) (dismissing declaratory judgment action as "duplicative" of statutory "Prompt Pay Act," breach of contract and quasi-contract claims; claim simply sought declaration that payments were owed, for which there was an adequate remedy at law).

## V. <u>CONCLUSION</u>

For the foregoing reasons, TD Ameritrade respectfully submits that its motion to dismiss should be granted, and requests that Plaintiff's Complaint be dismissed with prejudice.

Dated this 24th day of March, 2015.

TD AMERITRADE, INC., Defendant

By: <u>*s/ Victoria H. Buter*</u>
  Thomas H. Dahlk #15371
  Victoria H. Buter #23841
  KUTAK ROCK LLP
  The Omaha Building
  1650 Farnam Street
  Omaha, Nebraska  68102-2186
  Telephone: (402) 346-6000
  Facsimile: (402) 346-1148
  tom.dahlk@kutakrock.com
  vicki.buter@kutakrock.com

  A. Robert Pietrzak *(admitted pro hac vice)*
  Alex J. Kaplan *(admitted pro hac vice)*
  Jackie A. Lu *(admitted pro hac vice)*
  SIDLEY AUSTIN LLP
  787 Seventh Avenue
  New York, New York 10019
  Telephone: (212) 839-5300
  Facsimile: (212) 839-5599
  rpietrzak@sidley.com
  ajkaplan@sidley.com
  jlu@sidley.com

  *Attorneys for Defendant*
  *TD Ameritrade, Inc.*

43

## CERTIFICATE OF SERVICE

I hereby certify that on March 24th, 2015, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to the following attorneys registered with the CM/ECF system:

David S. Houghton
Daniel J. Epstein
HOUGHTON, WHITTED &
WEAVER, PC, LLO
6457 Frances Street, Suite 100
Omaha, Nebraska  68106
dhoughton@houghton-law.com
depstein@houghton-law.com

William R. Restis
Jeffrey R. Krinsk
Mark L. Knutson
Trenton R. Kashima
Finkelstein & Krinsk LLP
501 West Broadway, Suite 1250
San Diego, California  92101
wrr@classactionlaw.com
jrk@classactionlaw.com
mlk@classactionlaw.com
trk@classactionlaw.com

Gregory C. Scaglione
Patrice D. Ott
KOLEY, JESSEN LAW FIRM
1125 South 103rd Street
Suite 800, One Pacific Place
Omaha, Nebraska  68124
greg.scaglione@koleyjessen.com
patrice.ott@koleyjessen.com

By: *s/ Victoria H. Buter*
       Victoria H. Buter